FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ JUL 14 2014 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SAMUEL FRIEDMAN,
Individually and on behalf of All Others
Similarly Situated,

    Plaintiff,

- against -

MASPETH FEDERAL LOAN AND
SAVINGS ASSOCIATION,

    Defendant.

**MEMORANDUM, ORDER, & JUDGMENT**

13-CV-6295



**JACK B. WEINSTEIN**, Senior United States District Judge:

**Appearances**

| | |
|---|---|
| For Plaintiff: | Christopher M. Burke<br>Scott & Scott LLP<br>707 Broadway, 10th Floor<br>San Diego, CA 92101 |
| For Defendant: | Mark Cortegiano<br>65-12 69th Place<br>Middle Village, NY 11379 |

**Table of Contents**

I. Introduction ................................................................................................................. 2
II. Facts ........................................................................................................................... 3
 A. Background ............................................................................................................ 3
 B. Late Fees ................................................................................................................ 4
 C. Correspondence Regarding Late Fees ................................................................... 4
 D. Loan Payments ....................................................................................................... 5
III. Law ............................................................................................................................. 6
 A. Motion to Dismiss .................................................................................................. 6
 B. Real Estate Settlement Procedures Act (RESPA) ................................................. 6



|   | 1. | Statutory Framework | 6 |
|---|---|---|---|
|   | 2. | Business and Commercial Purpose Exemption | 8 |
|   |   | a) In General | 8 |
|   |   | b) Rental Property | 9 |
|   |   | c) Non-Owner Occupied Property Used for Family Purpose | 10 |
|   | 3. | Penalties | 11 |
| C. | New York State Law | | 11 |
|   | 1. | New York General Business Law § 349 | 11 |
|   | 2. | Breach of Implied Duty of Good Faith and Fair Dealing | 12 |
|   | 3. | Breach of Contract | 12 |
|   | 4. | Unjust Enrichment | 13 |
| IV. | Application of Law to Facts | | 13 |
| A. | RESPA | | 13 |
|   | 1. | Family Purpose | 13 |
|   |   | a) Relevant Factors | 13 |
|   |   | a) Non-rental Property | 15 |
|   | 2. | Qualified Written Requests | 16 |
| B. | State Law | | 16 |
|   | 1. | Supplemental Jurisdiction | 16 |
|   | 2. | New York General Business Law § 349 | 17 |
|   | 3. | Breach of Implied Duty of Good Faith and Fair Dealing | 18 |
|   | 4. | Breach of Contract | 18 |
|   | 5. | Unjust Enrichment | 18 |
| C. | Class Allegations | | 19 |
| V. | Conclusion | | 20 |

## I. Introduction

This case raises issues of first impression on the reach of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §2601, et seq. The Act was designed to throw the federal judiciary's protective cloak over residential-occupant owners of real property and their kin to protect against abuse by banks during loan closings and subsequent related events. The Act

should be broadly applied to accomplish its prophylactic purposes by exercising federal subject matter jurisdiction.

Plaintiff Samuel Friedman alleges that Maspeth Federal Savings and Loan Association ("Maspeth") improperly assessed late fees on seven mortgage payments. He sues for (1) violation of RESPA; (2) violation of New York General Business Law § 349; (3) breach of implied duty of good faith and fair dealing; (4) breach of contract; and (5) unjust enrichment. Am. Compl., ECF No. 17. A class action is proposed. *Id.* at ¶¶ 26-35.

Defendant's motion to dismiss is denied.

## II. Facts

### A. Background

Plaintiff resides at 730 East 3rd Street, Brooklyn, NY 11218. Am. Compl. ¶ 2. In 2008, he bought an adjacent single-family home, 734 East 3rd Street ("734"). *Id.*

The price was $625,000. Def.'s Mot. to Dismiss, Loan Application, Ex. D, ECF No. 21. To finance this purchase, he obtained a $437,500 mortgage loan. *Id.*; Am. Compl., Bond, Ex. A ¶ 4. His daughter and son-in-law ("children") live there with their offspring. They have been the only occupants since the purchase.

Applicants for the mortgage were asked to check whether the property would be a "primary residence", "secondary residence", or "investment". *See* Def.'s Mot. to Dismiss, Ex. D. Selected by plaintiff was "investment". *Id.*

The children as well as plaintiff made payments toward the mortgage. From 2009 to 2013, plaintiff's payments totaled $80,229.62. Def.'s Reply Mem. of Law in Further Supp. of Def.'s Mot. to Dismiss 4, ECF No. 27. Payments from the children totaled $103,756.71. *Id.* In

3

addition, plaintiff gave his children money "to cover the family's living expenses, including housing." Pl.'s Sur-Reply, Attach. 1, Decl. of Samuel Friedman ¶ 6, ECF No. 29.

### B. Late Fees

Payments on the loan were due on the first of each month. Am. Compl. ¶ 8. A grace period of fifteen days was allowed before a late fee could be assessed. *Id.*, at ¶¶ 8-9. The mortgage loan payment book provided by the bank emphasizes: "To avoid a late charge, payment must be <u>RECEIVED</u> by 8:00 P.M [sic] on the 16th of each month." *See* Am. Compl., Payment Book, Ex. B (emphasis in the original).

Alleged is that Maspeth improperly assessed seven late fees for payments that were due on: (1) March 1, 2011; (2) December 1, 2011; (3) March 1, 2012; (4) May 1, 2012; (5) August 1, 2012; (6) October 1, 2012; and (7) July 1, 2013. Am. Compl. ¶¶ 15-17, 20, 23; Pl.'s Documentation of Late Fees, ECF No. 18. Based on mail receipts now submitted by plaintiff—but not furnished to the bank before this suit was brought—payments should have been received by defendant prior to 8:00 P.M. on the sixteenth day of some of those months. *Id.* By January 2014, when the loan had been paid in full, plaintiff had accumulated, according to the bank, $457.83 in late fees. *See* Pl.'s Documentation of Late Fees.

### C. Correspondence Regarding Late Fees

On March 28, 2012, plaintiff mailed defendant a letter inquiring about these late charges. *See* Am. Compl., Ex E. Under RESPA, this letter constituted a qualified written request (QWR), obligating defendant to respond. *See* 12 C.F.R. § 1024.35. In the QWR, plaintiff requested a statement showing the payments he had submitted and the dates on which they had been received. *See* Am. Compl., Ex E. Defendant responded by mail on April 3, 2012, informing plaintiff that Maspeth had conducted an investigation and was enclosing his payment history. In

4

handwriting on the payment history sheet, defendant indicated when late charges were assessed and the amount. *Id.* at Ex. F.

By letter dated October 31, 2012, plaintiff then notified defendant that he had mail receipts proving that the payments were timely received. *See* Am. Compl., Ex. H. He requested: "(i) all late fees be reversed and (ii) the payment history be corrected to reflect that the payments were not received late by your office." *Id.*

On November 20, 2012, the bank responded: "It clearly states in our client's mortgage coupon book that the mailing of payments before the 16th of the month is not determinative if the Bank does not receive it within the grace period." *Id.* at Ex. I. It went on to list when, according to Maspeth's records, late payments had been received. *Id.* Plaintiff maintains that this letter does not contain an accurate statement of the instructions in the coupon book or of the dates his payments were received. *See* Am. Compl. ¶ 46.

D. **Loan Payments**

Plaintiff began making payments on the loan in January 2009. *See* Def.'s Reply Mem. of Law in Further Supp. of Def.'s Mot. to Dismiss, Ex. A. For the first five months, plaintiff paid the loan himself. *Id.* Beginning in May of that year and for about two years, plaintiff's children began contributing to the mortgage payments. *Id.* From August 2012 to December 2013, the children paid without contribution by plaintiff. *Id.*

In the period from 2009 to 2013 plaintiff contributed $80,229.62, or 43% of the payments made. *Id.* The children contributed $103,756.71, or 55%. *Id.* The remaining 2% were made by Judy Friedman and Body Tech Inc. 12-13, a company whose address is the same as the property at issue. *Id.*

In January 2014, plaintiff paid $415,561.40, the balance of the mortgage and fees in full, and transferred the deed to his daughter and son-in-law. *See* Declaration of Samuel Friedman at ¶ 7; *see also* Declaration of Mark L. Cortegiano, Ex. I.

**III. Law**

    **A. Motion to Dismiss**

On a motion to dismiss for failing to state a claim upon which relief can be granted, "a court must accept the plaintiff's factual allegations as true, drawing all reasonable inferences in plaintiff's favor." *Clark Street Wine & Spirits v. Emporos Sys. Corp.*, 754 F. Supp. 2d 474, 479 (E.D.N.Y. 2010). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Considered may be any written instrument attached as an exhibit or incorporated by reference to the complaint and integral documents relied on by the complaint. *Subaru Distrib. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). It is "legal feasibility of the complaint," and not the weight of evidence, that must be assessed. *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980).

    **B. Real Estate Settlement Procedures Act (RESPA)**

        **1. Statutory Framework**

RESPA was enacted to ensure that residential real estate owners were provided with adequate information on the costs of the loan, and to protect them from abusive business

practices flowing from the loan agreement and settlement process. *See* 12 U.S.C. § 2601(a)-(b). Lenders are required to disclose pertinent information in writing. *See* 12 U.S.C. §§ 2603-2610.

We are not left in doubt about Congressional design. The legislature made specific findings of its purpose:

> The Congress finds that significant reforms in the real estate settlement process are needed to ensure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country.

*See* 12 U.S.C. § 2601(a). *See also, e.g.*, John P. Kromer, Sanford Shatz, and Jonathan W. Cannon, *2010 Survey on RESPA Developments*, 66 Bus. Law. 435, 436 (Feb. 2011) ("making it easier for consumers"); Curtis J. Berger, *ULSIA and the Protected Party: Evolution or Revolution?*, 24 Conn. L. Rev. 971 (1992).

RESPA is essentially directed to achieve fair settlement procedures in acquisitions of property. *See* 12 U.S.C. § 2601(b) ("effect certain changes in the settlement process for residential real estate"). It is written broadly enough to cover post-settlement late charges. *See* 12 U.S.C. § 2602(1)(A) (including "loan...which...is serviced by a first lien...on residential real property...."); 12 U.S.C. § 2605(e)(1)(A) (duty of loan servicers to respond to borrower inquiries within five days); 12 U.S.C. § 2605(i)(2) (servicer "means the person responsible for servicing of a loan"); 12 U.S.C. § 2605(i)(3) (servicing "means receiving any scheduled periodic payments").

The Act has been interpreted as "remedial and protective." *See, e.g., Rawlings v. Dovenmuehle*, 64 F. Supp. 2d 1156 (M.D. Ala. 1999) (finding that Congress designed RESPA to protect consumers in response to abuses in real estate practices, and that the term "actual damages" broadly includes mental anguish damages). It "is to be 'construed liberally in order to best serve Congress' intent.'" *Id.* (citation omitted); *see also McLean v. GMAC Mortg. Corp.*,

2008 WL 1956285 (S.D. Fla. May 2, 2008) ("The court is persuaded by the rationale in *Rawlings* and finds that non-pecuniary damages are recoverable as 'actual damages' under section 2605").

## 2. Business and Commercial Purpose Exemption

### a) In General

Credit transactions made "primarily for business, commercial, or agricultural purposes" are exempt from RESPA. *See* 12 U.S.C. § 2606(a)(1); 21 C.F.R. § 1204.5(b); *see also FirstStorm Partners 2 LLC v. Vassel*, 2012 WL 1886942 (E.D.N.Y. Mar. 8, 2012). The definition of a business transaction under RESPA and the Consumer Credit Cost Disclosure Act is interpreted in the same way to protect consumers. *See* 12 U.S.C. § 2606(b); 15 U.S.C. § 1603(1); *see, e.g.*, 113 A.L.R. 197 (1993) (discussing disclosure). It is "plaintiff [whom] has the burden of showing that the transaction was a consumer credit transaction, not a business transaction." *Muia v. Brookview Rehab Funding*, 2011 WL 1748190 (N.D.N.Y. May 5, 2011).

Five factors determine if credit is extended primarily for a business or commercial purpose, as opposed to a residential, consumer purpose:

> A. The relationship of the borrower's primary occupation to the acquisition. The more closely related, the more likely it is to be business purpose.
> B. The degree to which the borrower will personally manage the acquisition. The more personal involvement there is, the more likely it is to be business purpose.
> C. The ratio of income from the acquisition to the total income of the borrower. The higher the ratio, the more likely it is to be business purpose.
> D. The size of the transaction. The larger the transaction, the more likely it is to be business purpose.
> E. The borrower's statement of purpose for the loan.

*See* 12 C.F.R. § 226.3, Supp. I, Cmt. (3)(i)(A)-(E); *see also Mauro v. Countrywide Home Loans, Inc.*, 727 F. Supp. 2d 145, 153 (E.D.N.Y. 2010); *see* 54 A.L.R. Fed. 491 (1981) (business or commercial purpose). By contrast, consumer credit is secured for "personal, family, or household purposes." *See* 12 C.F.R. § 226.2(a)(12).

8

### b) Rental Property

A rental property that the borrower does not intend to occupy is generally treated as one for a business purpose. *Mauro v. Countrywide Home Loans, Inc.*, 727 F. Supp. 2d 145, 154 (E.D.N.Y. 2010) ("[I]t is well settled that a loan obtained in order to invest in non-owner occupied rental properties is a loan for business purposes.") (citing Official Staff Commentary, Board of Governors of the Federal Reserve System, Section 226.3, Commentary 3(a)(3), 46 Fed. Reg. 50288, 50297 (Oct. 9, 1981)). If a member of the owner's family is to occupy the premises without payment of rent, it may be considered a loan for non-business and non-commercial purposes.

Different rules apply to non-owner-occupied and owner-occupied rental property. "Credit extended to acquire, improve, or maintain rental property (regardless of the number of housing units) that is not owner-occupied is deemed to be for business purposes." *See* 12 C.F.R. § 226.3, Supp. I, Cmt. (4). "This includes…the acquisition of…a single-family house that will be rented to another person to live in." *Id.*

Credit is deemed to be for business purposes in an owner-occupied rental property if it is extended to acquire property that contains more than 2 housing units, or if it is extended to improve or maintain rental property containing more than 4 housing units. *See* 12 C.F.R. § 226.3, Supp. I, Cmt. (5)(i)-(ii). By contrast, credit extended for property containing less housing units than described in Cmt. (5)(i) and (ii) is not determinative of whether the credit was extended for commercial or consumer purposes, and must be evaluated based on the factors set forth in Cmt. 3(i)(A)-(E). *Id.*

### c) Non-Owner Occupied Property Used for Family Purpose

Non-owner occupied family homes and multi-generational homes are a reality of the current socio-economic landscape. In recent decades, parents have come under increasing pressure to provide financial support for their adult children. *See* Sally F. Goldfarb, *Who Pays for the "Boomerang Generation"?: A Legal Perspective on Financial Support for Young Adults*, 37 Harv. J.L. & Gender 45, 50 (2014). In response, parents have increased their assistance for housing, food, education, services such as child care, and direct cash. *Id.*, 54-55. Although the regulations implementing RESPA shows that rental properties in general constitute use for a business purpose, *see* 12 C.F.R. § 226.3, Supp. I, Cmt. (4)-(5), neither the statute nor the regulations directly address non-owner occupied property for family purposes.

Many parents now allow their adult children to either remain in the family home or move back home, leading to a rise in multigenerational living arrangements. *See* Pew Research Ctr., The Return of the Multi-Generational Family Household 7, *available at* http://www.pewsocialtrends.org/2010/03/18/the-return-of-the-multi-generational-family-household/ (2010); Adam Davidson, *It's Official: The Boomerang Kids Won't leave*, N.Y. TIMES MAGAZINE, June 20, 2014. The trend is based upon many factors, including debt from college loans, the cost of housing, and unemployment. *See* Davidson; *see also* Goldfarb, at 52. The frequency of children moving back in with their parents has created a new term—boomerang child, defined as a young adult who returns to live at the family home, usually due to financial reasons. *See* Merriam-Webster, "boomerang child," www.m-w.com.

Another important current development is the practice of gifting assets to children while parents are still alive. *See* Goldfarb, at 63 (citing Anna Bahney, *The Bank of Mom and Dad*, N.Y. TIMES, Apr. 20, 2006; *see also* John H. Langbein, *The Twentieth-Century Revolution in*

10

*Family Wealth Transmission*, 86 Mich. L. Rev. 722, 729-38 (1988). By offering a financial support system for their children, parents help provide the stability necessary for progeny to pursue higher education, advance their nascent careers, and eventually establish their own family. *See* Goldfarb, at 57-61.

### 3. Penalties

Creditors who fail to comply with RESPA are liable to the borrower for an amount equal to the sum of "(a) any actual damages to the borrower as a result of the failure; and (b) any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $2,000." *See* 12 U.S.C. § 2605(f)(1)(a)-(b). A successful action entitles the borrower to "costs of the action, together with any attorneys fees incurred in connection with such action as the court may determine to be reasonable under the circumstances." *Id.* at § 2605(f)(3).

## C. New York State Law

### 1. New York General Business Law § 349

Section 349 of New York General Business Law protects consumers against deceptive practices. It provides: "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." N.Y. Gen. Bus. Law § 349. A claim brought under section 349 must satisfy three elements: (1) the defendant's acts or practices "must have been directed at consumers;" (2) the defendant's acts or practices "must have been misleading in a material way;" and (3) "the plaintiff must have sustained injury as a result." *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007); *see also Maurizio v. Goldsmith*, 230 F.3d 518 (2d Cir. 2000) (citing *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20 (N.Y. Ct. App. 1995)).

11

## 2. Breach of Implied Duty of Good Faith and Fair Dealing

An implied covenant of good faith and fair dealing is implicit in any express contract. *See Dalton v. Educational Testing Service*, 639 N.Y.S.2d 977, 979 (N.Y. Ct. App. 1995). "Neither party to a contract shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* Breach of the implied covenant requires that a party "directly violate an obligation that may be presumed to have been intended by the parties." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407–08 (2d Cir.2006) (quotation marks omitted). *See also 511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (N.Y. Ct. App. 2002) (implied covenant encompasses "promises which a reasonable person in the position of the promisee would be justified in understanding were included" (citing *Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 69 (N.Y. Ct. App. 1983))).

Obligations may not be inconsistent with terms found in the express contract. *See Dalton*, 87 N.Y.2d at 289. Breach of an implied covenant of good faith and fair dealing is "merely a breach of the underlying express contract." *Harris v. Provident Life and Acc. Ins. Co.*, 310 F.3d 73 (2d Cir. 2002) (citing *Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992)); *see also ICD Holdings S.A. v. Frankel*, 976 F. Supp. 234, 243-44 (S.D.N.Y. 1997) ("A claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract.").

## 3. Breach of Contract

Three elements must be satisfied in order to establish breach of contract: (1) existence of the contract; (2) breach of the contract; and (3) damages as a result of the breach. *National*

*Market Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520 (2d Cir. 2004) (citations omitted). The injured party must prove that breach was a direct, proximate cause of the damages alleged. *Id.*

### 4. Unjust Enrichment

A claim of unjust enrichment requires that: (1) the defendant was enriched; (2) at the plaintiff's expense; and (3) "equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004) (citing *Clark v. Daby*, 751 N.Y.S.2d 622, 623 (N.Y. Ct. App. 2002)).

## IV. Application of Law to Facts

### A. RESPA

#### 1. Family Purpose

##### a) Relevant Factors

Plaintiff has satisfied each factor considered in determining whether a transaction is for personal, family, or household use and therefore protected by RESPA. *See* part III.B.2, *supra*. He states that, although he does own other property, his primary occupation is a restaurant operator. *See* Decl. of Friedman ¶ 9. His other properties were either inherited, held as trustee, or occupied by family. Insofar as those other properties are investments, there appears to be no relationship between them and the home purchased for his daughter.

The level of involvement a plaintiff has in maintaining the property is significant. Nothing in the record indicates plaintiff has performed any maintenance on the property, other than payments on the mortgage. His children, while living in the property, have been responsible for upkeep.

Plaintiff claims that he did not intend to, and in fact did not, receive income from the property. *See* Decl. of Friedman ¶ 5, 7. Rather, he wanted to gratuitously provide a home for his daughter and her family. *See id.* ¶ 6. Rent is discussed in IV.A.2, *infra*.

The size of the loan was appropriate for a mortgage on a residential property. It was for $437,000, which was 70% of the purchase price. This loan-to-value ratio is characteristic of residential real estate. *See, e.g.,* Oren Bar-Gill, *The Law, Economics and Psychology of Subprime Mortgage Contracts*, 94 Cornell L. Rev. 1073, 1076 (2009).

Plaintiff did indicate on the loan application that the property was purchased as an "investment". *See* Def.'s Notice of Mot. to Dismiss, Ex. D. But the loan application provides only three options to select for the purpose of the purchase: "primary residence"; "secondary residence"; and "investment". It was not his primary or secondary residence since he maintains that he intended to purchase the home for his children to live in without paying rent, not to make a profit. Pl.'s Opp'n to Def.'s Mot. to Dismiss the Am. Compl. 6, ECF No. 25. Of the three available options, it was appropriate to select "investment" because he did not intend to reside there. *See* Decl. of Friedman ¶ 3. Under the circumstances, his understanding does not appear unreasonable. It is the statutory definition of what is residential or investment property that counts, not the selection on a limited form provided by the seller. This was, for statutory purposes, a residential mortgage.

In this case, plaintiff's daughter lives in a separate home adjoining plaintiff's. She has received substantial financial assistance. Plaintiff may have many personal reasons for wishing to provide nearby housing for his children. The arrangement is conducive to maintaining a close-knit familial relationship with his children and grandchildren, and it may address a concern for his own care as he ages and may require assistance from younger generations. In many

communities, extended families play a critical role in ensuring a stable and vibrant environment. *See* Goldfarb, at 60.

The fact that plaintiff has the means to buy a home for his child without seeking a profit from the purchase should not bar him from seeking relief under a federal statute designed to protect homeowners from abusive business practices.

Plaintiff sufficiently pleads that the loan was obtained for consumer—that is, personal, family, or household—purposes.

### a) Non-rental Property

Plaintiff and defendant disagree on whether the mortgage payments by plaintiff's daughter and son-in-law constitute rent. Defendant argues that payments made toward the mortgage in this instance constitute rent. *See Wilson v. La Van*, 22 N.Y.2d 131, 135 (N.Y. Ct. App. 1968) (holding that payments toward expenditures, such as mortgages and taxes, "could be considered as the plaintiff's rent for the use of the land"); *see also Marini v. Lombardo*, 79 A.D.3d 932, 934 (N.Y. App. Div. 2010); *Joseph v. Burke*, 981 N.Y.S.2d 636 (Dist. Ct. 2013).

Not mentioned by either party is defendant's handwritten note on the loan application that he receives $2,250 income in "Subject rent." *See* Loan Application in Def.'s Notice of Motion to Dismiss Pl.'s Am. Compl., Section V and Property Information, Ex. D. The court gives no weight to this fact since its significance is unclear.

There is no evidence that plaintiff and his children intended to enter into a landlord-tenant relationship. Plaintiff reasonably claims that he provided funds to his children for them to contribute toward mortgage payments as a lesson in financial responsibility. *See* Decl. of Friedman ¶ 6. The mortgage payments by the children cannot be assumed to be rental payments.

Plaintiff sufficiently alleges that he, his daughter, and his son-in-law intended to share resources as a family without establishing a tenancy.

### 2. Qualified Written Requests

Plaintiff alleges that Maspeth's investigation and response were insufficient and that it failed to correct the error. *See* Am. Compl. ¶¶ 45-46. When plaintiff obtained the loan, defendant issued a loan payment booklet. *See id.*, Ex. B at B-1. As previously noted, the booklet states: "To avoid a late charge, payment must be <u>RECEIVED</u> by 8:00 P.M [sic] on the 16th of each month." *Id.* at B-4 (emphasis in the original). Plaintiff's amended complaint includes mail receipts from four of the seven contested late payments. *See* Am. Compl., Ex. C, D, G, and J. The receipts support a possible inference that defendant received the payments before the 8:00 P.M. deadline on the 16th of those months. *Id.*

Defendant responds that it complied with RESPA when it conducted an investigation, presented the requested information, and was not provided with the plaintiff's mail receipts in order to correct any errors. *See* Def.'s Reply Mem. of Law in Further Supp. of Def.'s Mot. to Dismiss at 12. Because plaintiff has now provided evidence plausibly demonstrating for purposes of pleading that defendant gave incorrect information, the complaint states a valid claim under RESPA.

### B. State Law

### 1. Supplemental Jurisdiction

A district court may exercise supplemental jurisdiction over state claims that are "part of the same case or controversy" as the federal claim. *See* 28 U.S.C. § 1367(a). It is in the discretion of the court to determine if supplemental jurisdiction is warranted. The court is now

16

immersed in the case and the parties have expended considerable time and incurred attorney's fees. In the interest of judicial efficiency, it is proper to exercise supplemental jurisdiction.

### 2. New York General Business Law § 349

Plaintiff states a valid claim for relief under New York General Business Law § 349. *See* III.C.1, *supra*.

He alleges that defendant's acts and practices regarding late fees constitute consumer-oriented conduct. The payment book is a standard form distributed to any customer who has a Maspeth mortgage. It is directed toward the general credit consumer. *See, e.g., Kapsis v. Am. Home Mortgage Servicing Inc.*, 923 F. Supp. 2d 430, 450 (E.D.N.Y. 2013).

Section 349 requires that the act or practice mislead consumers in a material way. *See Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 25 (N.Y. Ct. App. 1995). The payment booklet's instruction that payments will be timely if received prior to a specific deadline arguably is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Id.* at 26. A reasonable consumer would rely on the payment booklet's instructions regarding late fees. It might be concluded that plaintiff took reasonable steps to ensure that his payments were received by the deadline: he paid for the appropriate type of postage; tracked the mailing; and received confirmation of timely receipt.

It is alleged that defendant caused an injury. *See* Am. Compl. Plaintiff contends that he suffered economic and emotional harm arising from defendant's acts or practices. *See* Pl.'s Opp'n to Def.'s Mot. to Dismiss at 22. Although he does not explain the symptoms or consequences of the emotional harm, he does specify that the harms included "annoyance, harassment, time, frustration, anger, and anxiety." *See* Am. Compl. ¶ 60. Such harms may be

sufficient to demonstrate an injury independent of the breach of contract. *See Rozier v. Fin. Recovery Sys., Inc.*, 2011 WL 2295116 (E.D.N.Y. June 7, 2011).

### 3. Breach of Implied Duty of Good Faith and Fair Dealing

Under New York law, the same facts cannot give rise to both a claim for breach of contract and a claim for breach of implied duty of good faith and fair dealing. *See, e.g., Mendez v. Bank of Am. Home Loans Servicing, LP*, 840 F. Supp. 2d 639, 651-52 (E.D.N.Y. 2012) (citing *American Holdings, Inc. v. Canadian Imperial Bank of Commerce*, 894 N.Y.S.2d 47, 49-50 (1st Dept. 2010)). In the instant case, the facts supporting each claim are not identical. The breach of contract claim is based on defendant's improper assessment of late fees. Relied on for the breach of the implied duty claim is the allegation that Maspeth misrepresented its records and policy, depriving plaintiff of the fruits of their agreement and causing emotional harm.

This claim survives the motion to dismiss.

### 4. Breach of Contract

Defendant does not separately move to dismiss plaintiff's breach of contract claim. Instead, it argues that the court should not exercise supplemental jurisdiction over this claim. Because the court is exercising supplemental jurisdiction, *see* IV.B.1, *supra*, plaintiff's claim for breach of contract survives the motion to dismiss.

### 5. Unjust Enrichment

Defendant argues that the claim for unjust enrichment should be dismissed because both parties acknowledge the existence of a valid contract covering the issue of late fees. But the parties have not agreed on what documents constitute the contract. Plaintiff claims that the contract includes the mortgage, bond, and payment book. *See* Am. Compl. ¶ 70. Defendant acknowledges that the mortgage and bond are contractual obligations, but it does not concede

18

that the payment book is part of the contract. Def.'s Mem. in Supp. of Def.'s Mot. to Dismiss, ECF No. 21, 17-18. Plaintiff's theory of quasi-contract stands.

It is plaintiff's contention that defendant was unjustly enriched by charging late fees on timely payments. *See* Am. Compl. ¶ 79-82. In order to state a claim for unjust enrichment, plaintiff must show that "equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004). Plaintiff's receipts indicate that defendant physically received the payments prior to the payment book deadline. Accepting these facts as true, plaintiff has stated a claim for unjust enrichment.

### C. Class Allegations

Defendant moves to dismiss plaintiff's claim for class allegations because it lacks "factual detail." *See* Def.'s Memo. in Support of Mot. to Dismiss 20. This argument fails. Plaintiff plausibly alleges that defendant's mis-handling of late fees constitutes a uniform practice applicable to a large number of bank clients. Am. Compl. ¶ 26. *Cf.*, *e.g.*, James M. Mulligan and J. Chris Kinsman, "RESPA Class Action Litigation Concerning Yield Spread Premiums", 26 Colorado Lawyer No. 9, p. 111 (1997). The class action issues will be addressed subsequently.

## V. Conclusion

Defendant's motion to dismiss is denied. Expedite discovery.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Date: July 10, 2014
Brooklyn, New York